BOBBIE FERSTLE and CAROL A. HOLMES, Plaintiffs

v.

AMERICAN SAMOA GOVERNMENT, COSMETOLOGY BOARD, DEPARTMENT OF PUBLIC SAFETY, HELGA LEFITI, GRETCHEN L.S. MAKAIWI, and DOES 1-10, Defendants

High Court of American Samoa
Trial Division

CA No. 4-87

February 5, 1988

Before KRUSE, Associate Justice, LUALEMAGA, Associate Judge, and VAIVAO, Associate Judge.

Counsel: For Plaintiffs, William Reardon
For Defendants, Phyllis Coven and Martin Yerick, Assistant Attorneys General

Plaintiffs, Bobbie Ferstle and Carol Holmes, filed suit for damages against: the American Samoa Government; the Cosmetology Board of American Samoa; the Department of Public Safety; two named members of the Cosmetology Board, Helga Lefiti and Gretchen Makaiwi; and others joined under the fictitious Doe identity. The claims essentially arise consequent to unsuccessful attempts by plaintiffs to persuade the Cosmetology Board to license plaintiff Carol Holmes as a Cosmetician/Hairdresser under the provisions of the Beauty Culture Act, (hereafter the "BCA") A.S.C.A

28

§§ 31.1502 et seq., and plaintiff Bobbie Ferstle as the proprietor of a beauty shop called "Mr. Paul's". In addition, pending resolution of these applications, Ms. Holmes was placed under arrest at Mr. Paul's by an officer of the Department of Public Safety for using a curling iron and thereby, allegedly practicing as a hairdresser in violation of the BCA. The plaintiffs urge that the arrest was unlawful and incited through a conspiratorial design of the defendants.

The complaint generally alleges that as a proximate result of the actions of defendants and each of them, plaintiffs have been specially and generally damaged.

As a result of pre-trial orders entered in this matter, the Cosmetology Board and the Department of Public Safety were stricken as inappropriate party-defendants. Justice Murphy's reasoning appeared to be that both the department and the board were within the rubric, "American Samoa Government". Also as a result of these motions, plaintiffs identified their cause of action as based on the Federal Civil Rights Act, 42 U.S.C. sections 1983 and 1985. For reasons heretofore given, the Court had granted American Samoa Government's motion for summary judgment in that a Civil Rights Act cause of action did not lie against the government as a matter of law.

At the time of trial, the two named members of the Cosmetology Board were the remaining defendants. Plaintiffs had not identified any of the defendants named in the complaint as Does.

## FACTS & LEGAL BACKGROUND

One Paul Parks, a former resident of the territory, had owned and operated up until the close of 1985 a beauty salon known as "Mr. Paul's". Employed with the salon as a beautician was plaintiff Carol Holmes. Ms. Holmes had apparently worked for Mr. Paul's under the misapprehension that she was not subject to additional local licensing as she held a Washington State license. She assumed that she was able to do all the things she was permitted to do in Washington. It was her belief that that was how it works with all the states of the Union.

29

At or around the year's end, the business was made available for sale after Mr. Parks had departed the territory, leaving Ms. Holmes to run and manage the salon. Also around this time frame, Plaintiff Bobbie Ferstle had returned to the territory for a visit and was introduced to the idea of acquiring Mr. Paul's. Ms. Ferstle had then recently qualified as a beautician according to the laws of the State of California. Ms. Ferstle acquired the salon and then sought to obtain a business license.

## Business License Act:

A business license is required of any person or entity proposing to engage in business within the territory. See A.S.C.A. §§ 27.0201 et seq. The licensing process is an annual requirement,[1] and as a business license is by terms of the statute, deemed personal, it is not transferable.[2] Accordingly, Ms. Ferstle had to apply for a license to operate Mr. Paul's on her own standing.

In practice, the application for a business license entails a procedure of securing approvals from a number of government agencies and commissions appropriate for licensure of the particular business activity proposed. These approvals are signified by the approving agency by signature on the application form provided for routing through the various agencies. After the application form is complete with the relevant approvals, and upon the applicant's payment of a set fee, a business license is issued.

In plaintiff Ferstle's case, the Cosmetology Board was a statutorily appropriate board included in the approval process by reason of the provisions of the BCA.

## Beauty Culture Act:

The BCA was first enacted some time in 1973. According to the testimony of defendant Helga Lefiti, a longstanding salon operator in the territory, the enactment came about after a member of the public received severe chemical burns to her

---

1 A.S.C.A § 27.0209.

2 A.S.C.A § 27.0212.

30

face as a result of "beauty" treatment. The Act is regulatory in purpose and classifies the grooming profession as "Hairdressers" and "Cosmeticians" and provides separate definitions of these terms. See A.S.C.A. § 31.1502(d),(e). As initially enacted in 1973, (26 A.S.C §§ 1100 et. seq.) the statute provided for implementation by the Governor's Office, but the 1983 amendment to the Act took this implementation function away from the Governor's Office and created an independent licensing authority known as the "American Samoa Board of Cosmetology". See A.S.C.A. § 31.1502.1. This enactment established the board as consisting of 5 members appointed by the Governor for staggered 3 year terms. At least 2 of the membership must be licensed operators (i.e. "hairdresser" or "cosmetician") and the board elects a chairman from its members and meets quarterly or more frequently at the call of the chairman. Administrative and staff services for the board are to be provided by the Office of Economic Development, with legal assistance to come from the Office of the Attorney General.

Generally, the board is charged with a dual licensing function: the licensure of operators[3]; and the licensure of the facility for the beauty salon[4].

### The License Application Saga:

According to the testimony of plaintiffs, the license application was first initiated by Ms. Holmes toward the end of 1985 or early 1986. Ms. Holmes testified that she had taken the application to all the agencies and everything had checked out up until the Cosmetology Board.

Plaintiffs further testified that on or about the 11th or 12th of February, 1986, the application was taken personally by both of them to defendant Makaiwi as chairman of the Cosmetology Board. In the discussion that ensued, Makaiwi was apprised of Ferstle's recent graduation under the State of California's requirements. Makaiwi then opined

---

[3] A.S.C.A § 31.1504, Licensure of Operators.

[4] A.S.C.A § 31.1505, Licensure of Beauty Salons.

31

that Ferstle would not be eligible under the BCA to be licensed as an "operator" in that the statute, which contained a reciprocity measure, also required a practical working experience of 3 years within the last 5 years immediately preceding the license application. What followed in the discussion was not clear to the Court, but the plaintiffs left the meeting with certain impressions. Their understanding was that Carol Holmes, with her Washington State certification, would demonstrate proof of qualification under the BCA as an "operator" for purposes of licensing, and that in the interim, they could proceed to open for business. Plaintiffs in their recollection were sure that Ms. Makaiwi had signed and approved the application for them to open for business, pending Ms. Holmes' proof of practical experience.

Ms. Makaiwi on the other hand cannot recall signing anything as she was only one member of a board. In retrospect, she had no personal objection to the business being opened at the time provided Ms. Holmes could satisfy the Cosmetology Board of her practical background. She recalls advising plaintiffs that the board was convening in a matter of days and would take up the application.

The salon, still known as "Mr. Paul's", was reopened on February 14, 1986. Ms. Holmes was clear on this date as it was Valentine's Day.

In reviewing the numerous documented exhibits received into evidence, we find that a copy of plaintiff Ferstle's actual application for a business license affirms Ms. Makaiwi's recollection as more accurate. The application is dated 2/14/86, Valentine's Day, and the Court notes that the section in the form for approval or declination by the Cosmetology Board is unsigned. The Court also notes on the application that the various other approving agencies that signed off on the form all did so on 2/20/86, which was after the time the meeting with Makaiwi was said to have occurred. In point of fact, even if Ms. Makaiwi had signed off on the application, in derogation of board function, a business license could not have been issued any earlier than February 20, 1986. Therefore, the salon was opened on February 14, 1986 prematurely and in violation of the licensing laws.

32

On or about February 19, 1986, the Cosmetology Board convened and included in the board's agenda were the two license application: that of Ms. Holmes for board approval as an operator, and that of Ms. Ferstle for approval of the facility as a salon. The minutes of the meeting contain the following entry:

> The Board had asked both Mrs. Ferstle and Mrs. Holmes to submit their Cosmetology licenses and official working experience reference for the Board's evaluation. (Emphasis theirs).

Apparently as a result of this meeting, Chairman Makaiwi telephoned Ms. Ferstle and advised her that the salon could not be licensed until the board received proofs on the practical experience requirement under the BCA. Plaintiffs' testimony was that the salon closed thereafter.

Two days afterward, on February 21, 1986, a quorum of the board reconvened to consider a telex message submitted by plaintiffs. The telex on its face showed transmission origin as the United States Coast Guard Center in Seattle, Washington, its text stated: "Carol Holmes was employed as a part time hairdresser for the past eight years with the CG Exchange", and it was sent under signature of Warrant Officer W.H. Hoit. Added and typed to the bottom left corner of the telex sheet was a "True Copy Certification" notation and the signature of a Lt. J.M. Holmes, USCG, Coast Guard Liaison Officer to the Government of American Samoa. Also appended to the telex was a memo under letterhead of the U.S. Coast Guard, Liaison Office, American Samoa, from Lt. Holmes to the Cosmetology Board. The memo bears the date "21 Feb. 1986" and the text is reproduced as an appendix hereto.

At this meeting of the Cosmetology Board, two of its members were absent. Those present were defendants Makaiwi and Lefiti and the board's secretary, Mrs. Howland. The minutes prepared by Mrs. Howland indicated two things that bothered the board. One was the fact that the certifying Lt. Holmes was the husband of plaintiff Carol Holmes. Secondly, the board took umbrage with the suggestive references in Lt. Holmes' memo about cross checking the validity of the telex with the Governor's Office, coupled with the warning that the Office of the Governor was to be informed if

33

problems arose with the board's acceptance of the telex.

Needless to say, Lt. Holmes' approach to the board was atypical of a liaison. He did Ms. Holmes no favors that day by, in effect, inviting suspicion and an appropriate degree of scrutiny from the board on the sufficiency of the offered telex showing. Although not reflected clearly in the minutes, Ms. Makaiwi mentioned another factor that inclined the board away from accepting the telex as sufficient. This was a reference in the telex to Ms. Holmes' employment as a "part time" hairdresser for the previous 8 years. The board was uncertain whether 8 years "part time" could equate with 3 years "full time" as the statute appeared to the board to require.

The board voted against accepting the telex, but further decided to seek a legal opinion on the matter. The minutes reflect a meeting with Assistant Attorney General Griesmann that afternoon. He concurred with the board action and agreed to document his opinion, upon board insistence.

The actions, or inactions, of the board prompted Lt. Holmes, as his memo had promised, to take the licensing case up with a number of senior staff members in the Governor's Office. He testified that he also saw the Lt. Governor as well as the board's counsel Griesmann. His complaints did not go without sympathy. Defendants testified that they variously began to receive repeated telephone calls at their respective places of employment, from different staff members regarding the delay in approval of plaintiffs' license applications.

The position of the staff members was explained in the testimony of Ms. Cher Vink, Special Assistant to the Governor. She testified that the license application matter came to her attention some time in late February or early March, 1986. The application and the Cosmetology Board was the subject of several discussions with the staff. There was dissatisfaction expressed over public complaints about frustrating delays in the licensing procedure.

On the other hand, the board's concern, as given by the testimony of defendants, was the

34

staff's inordinate interference with the board's duties over this particular application. Ms. Makaiwi testified that this particular application was the subject of more board meetings than any other she could recall, in the attempt to accommodate plaintiffs.

Added to the board's perceived difficulties was confusion over the fact that their counsel had not only failed to give them the written opinion expected, but had also changed his opinion of the sufficiency of proofs. (Mr. Griesmann had departed the territory by the time of trial, however a transcript of his earlier deposition was stipulated for admission into evidence.) Counsel's change of mind came about after having been presented by plaintiffs' counsel, William Reardon, a photocopy of Ms. Holmes' Washington State Cosmetology license. He deposed that this appeared to be sufficient information upon which to grant a license.

The board next met on March 14, 1987 and according to the exhibits in evidence, Attorney Reardon had earlier presented Ms. Makaiwi the Washington State license of Ms. Holmes, and left her a copy thereof. Presumably, this copy was before the board's consideration in their meeting of March 14, 1987, but it apparently did not weigh sufficient with the board as demonstrating the practical requirement, notwithstanding counsel Griesmann's views. The minutes of that day contain the following entry:

> The Board has not yet received from both Mrs. Carol Holmes and Mrs. Bobbie Sue Ferstle their official working experience references as they were asked by Chairman Makaiwi. (Emphasis theirs).

The events of March 14, 1986 did not conclude here. The board decided to tell their side of the story to the Governor. Ms. Lefiti and Ms. Howland met on behalf of the board that same afternoon with the Governor. The agenda earlier determined and presented to the Governor was: the board's request for new counsel; the board's complaint about the active role taken by certain of the Governor's staff in the case of plaintiffs' license application; and finally certain concerns of the membership regarding the legality of the board's then composition and uncertainty over the tenure of

35

3 of the members. Two of these matters require further elaboration.

Counsel Griesmann's change of position revived with the board an old tension in their relationship with counsel, giving rise to membership questions regarding, and we quote, "his loyalty". The board had on earlier occasions requested of both the Governor and the Attorney General assignment of different "impartial" counsel. The board had considered counsel Griesmann to be unresponsive on earlier occasions and at times unable to discriminate his duties to the board from his other role as director of the Consumer Protection Bureau in situations of conflict.[5]

In the area of membership makeup and tenure uncertainty, the board's concerns were as follows. The BCA requires that at least 2 board members be licensed operators. In fact, the board as then constituted had one such member, Ms. Lefiti. The board suggested to the Governor that either Ms. Makaiwi or Ms. Howland would offer to resign to permit the appointment of one other licensed operator. The membership recommended Ms. Dorothy Tarasawa. Secondly the board pointed out what was to them a typographical error in the Executive Memorandum containing the formal appointments of its most recent members, namely, Ms. Howland, Ms. Galea'i, and Mr. Ivi Peneueta. This Executive

---

[5] The merits of the board's complaint are not at issue and warrant no comment from the Court, save to the extent that we need to mention the fact that a strain in relationship occurred. This is not to take anything away from counsel. His situation in the Territory highlights the peculiarities of a small community attempting to rise to meet growing demands of the modern day, necessitating a greater degree of multifarious roles being imposed upon individuals often without any corresponding increase in personal economic gain. Just a few years back, there was no Board of Cosmetology or Consumer Protection Bureau. Ironically, the members of the board, as is the case with those of other executive commissions, are themselves volunteers and have taken on these added duties in the name of civic responsibility.

Memorandum #002-1986, dated January 2, 1986 had provided term expiry dates for all the 3 new members as being March 20, 1986, which literally meant tenure of some 77 days, and not reflecting the 3-year staggered terms required by the BCA. The board requested that corrective action regarding the apparent oversight be taken accordingly.

As it happened, the Governor's staff had a different approach in rectifying these composition concerns, and more will be said of it later.

As noted above, notwithstanding production of Ms. Holmes' Washington license, and attorney Griesmann's opinion thereon, the board in it's meeting of March 14, 1986 was unpersuaded that the proofs (i.e. the telex and Ms. Holmes' Washington certificate) had sufficiently demonstrated 3 years of practical experience.

This conclusion appears to have been anticipated by Ms. Holmes. At her request, a letter under United States Coast Guard letterhead, dated March 10, 1986, was mailed to Ms. Holmes bearing the following communication: "In reference to your telephone call this date. This letter is to certify to the fact that you were employed as a hairdresser with the CG Exchange for the past eight years." The letter was signed by W.H. Hoit, Chief Warrant Officer, and with the notation: "By direction".

On or about March 17, 1986, Ms. Holmes supplied her lawyer, Mr. Reardon with the said letter along with her written instructions indicating a desire to conclude the license that day with the hope of opening for business on the following. In accordance with his client's request, Mr. Reardon visited Ms. Lefiti at her salon that day (Ms. Makaiwi was at this time absent from the territory) to discuss the letter from the Coast Guard. Ms. Lefiti refused to discuss the matter at the time and advised counsel to await the return of board chairman Makaiwi. On the other hand, counsel persisted in attempting to persuade Ms. Lefiti to sign something.

The exchange ended on a less than cordial note. Ms. Lefiti in her testimony reacted to being, in her words, "harassed" by counsel at her salon while she was working on a customer with

chemicals. She refused to sign some paper which counsel was insisting she sign. The Court learned nothing further of this piece of paper.

On the following day, counsel prepared a letter addressed to the Cosmetology Board demanding that the board convene within 48 hours with notice to his clients and for the board to sign the business license application. The letter was delivered to Ms. Lefiti on March 19, 1986 with distribution list to: the Governor's Office; Mr. Griesmann; and board members.

Paper was met with paper. A letter was prepared by Ms. Howland and dated March 20, 1986, signed by both herself as Secretary and by Ms. Lefiti as Acting Chairperson. The letter was addressed to the Attorney General with a corresponding distribution list, including Mr. Reardon. The letter set out the board's reasoning in not accepting the telexed message, and further acknowledged the Coast Guard letter of March 10, 1986, which would be acted upon only by the board when it convened after the return of the chairman in the following week. The letter further noted the board's refusal "to be directed, and intimidated by Mr. Reardon's time frame of 48 hours for the Board to convene". It concludes with reiteration of the request for different counsel.

From this point in time, the licensing saga is next placed at the Governor's Office. We above noted the board's concerns regarding composition and tenure and its recommendations for corrective action. The staff action taken in connection herewith was altogether different. Another Executive Memorandum, #37-86, was prepared and presented to the Governor for execution and made effective March 20, 1986. The memorandum had the effect of removing the three "short term" appointees, while substituting three new members, including the prior board's recommendation of Ms. Tarasawa.

The following day produced a bizarre turn of events which placed the Governor in a compromising situation. Ms. Lefiti testified that she had received a telephone call from one of the secretaries at the Governor's Office to assemble the Cosmetology Board for a meeting with the Governor on March 21, 1986. She was given no idea what the agenda might be and accordingly the rest

38

of board (as Ms. Lefiti still believed them to be) was equally in the dark as to the purpose of the meeting. Similarly, counsel Griesmann was notified of the meeting and his deposition reveals that he had no idea of the purpose thereof.

On the evidence, the Governor was only expecting to formally announce and greet the newly constituted board as had been a practice in the past. On the other hand, Special Assistant to the Governor Lydia Faleafine testified that in the normal course of announcing new memberships on boards and commissions, the practice has been to notify outgoing members first, before announcing the incoming members. This did not happen in this instance and Ms. Faleafine was at a loss as to why there was a departure from practice.

As it happened, a number of people congregated at the waiting lounge of the Governor's Office without any concerted idea as to the purpose of the gathering. They comprised the old members of the board, the new members, and attorneys Griesmann and Reardon.

At the actual meeting with the Governor, Ms. Lefiti was the only old board member called to attend, along with the new members as well as counsel. Certain of the replaced and excluded members, upon ascertaining the situation, were vociferous in expressing disgust with the whole affair as a humiliation and a waste of time away from normal routine. Further, in reaction to a number of matters associated with plaintiffs' licensing case, Ms. Howland had taken along to the meeting a strongly worded letter of resignation, which became more opportune for tendering at the time.

Inside the Governor's Office, the meeting also escalated to a lively discussion tone, and while the evidence was not clear on how the matter arose, the merits of plaintiffs' license application became a part of the agenda. The Governor rightly prevailed by deferring the issue to the new Cosmetology Board and closed the meeting. We find

no further evidence of staff involvement after this date[6].

One further matter for mention, which is chronologically contextual at this point is that Mr. Paul's opened its doors for business as a "barber shop". While plaintiffs' efforts to secure board approval continued to remain pending, the dialogue between counsel gave rise to the suggestion that a business license be also sought to operate a barber shop. Mr. Griesmann took the view as the Consumer Protection Bureau Director that barber shops were not covered by the BCA, and in point of fact, the Cosmetology Board had subscribed to this policy.[7] Ms. Makaiwi testified

---

[6] The involvement of the Governor's staff in the licensing proceedings was inappropriate. Given the above-noted 1983 Amendment to the BCA, licensing jurisdiction under the enactment was vested in a Cosmetology Board, created to displace the Governor's office from involvement in the Act's administration.

[7] This policy is interesting, although somewhat curious. The term "hairdresser" as defined in the BCA ostensibly extends to what barbers traditionally do, that is, "cutting . . . the hair of another person". See A.S.C.A. § 31.1502(e). However the effect of policy has been to recognize or establish a special classification, "barber", as exempted from the regulatory scope of the BCA. The terms "barber" and "barber shop" do not appear in the BCA although counsel has referred us to certain health regulations in the American Samoa Administrative Code §§ 25.0201 et seq., where the terms "barber" and "barber shop" are in fact defined and respectively treated as synonymous with the terms "beautician" and "beauty parlor". These regulations were promulgated in 1964 by the Director of Health pursuant to the Facility Health Permits Act, now A.S.C.A. § 25.0501. This enactment has nothing to do with regulating, as a profession, barbers and beauticians. Its primary purpose is sanitation measures with facilities involving the public at large. Through the regulations, it requires, among other things, bathrooms with barber shops and

40

that she was contacted by the Development Planning Office on the barber shop application, and she declined jurisdiction.

A barber shop license was issued on March 20, 1986, and on March 22, 1986, plaintiffs resumed business.

We come now to March 24, 1986, and a new set of characters enter the picture. Police Officer Marlene Moana visited Mr. Paul's on this day where she encountered Ms. Holmes working with a customer. In Officer Moana's words, she observed Ms. Holmes using a "curling iron" to curl hair and determined that Ms. Holmes was acting in violation of the BCA. She placed Ms. Holmes under arrest and took her to the police station. At the station Ms. Holmes, with the attendance of her counsel, Mr. Reardon, was put through the booking procedures and then released. The officer prepared and forwarded her report to the Attorney General's Office with the recommendation for prosecution.

Officer Moana expressed her disappointment as a police officer that the Attorney General's office had chosen not to prosecute. She testified that on the day prior to the arrest, she was summoned by the Commissioner of Public Safety and was assigned to investigate complaints about certain people undertaking hairdressing work without the appropriate approvals from the Cosmetology Board. In the course of her investigation, she researched the BCA and searched the licensing records at the Office of Development Planning, talking to a Mr. Petelo Uti. Mr. Uti referred her to defendant Makaiwi as someone from the Cosmetology Board to interview. She interviewed Ms. Makaiwi, and in relation to Mr. Paul's, Ms. Makaiwi informed her that the owner Ms. Ferstle had applied to the board for a license to operate a beauty salon facility and was turned down. She was, however, aware that Ms. Ferstle had a barber shop license. With regard to Ms. Holmes, the board had also turned down her application for a hair styling license.

As a result of her investigations, Officer Moana visited three establishments, including Mr.

_____

beauty parlors. Hence the Health Department's involvement with the approval process of plaintiffs' application.

41

Paul's, where the arrest was made. At the other places she visited, the officer found the facility located at the Pago Plaza center open, but without customers. She also visited a shop at the Rainmaker Hotel and found the same locked in the morning. She again checked this shop in the afternoon, and while it had opened, she found no customers there at the time.

Ms. Holmes testified that while no force or verbal abuse was used by the officer in effectuating arrest she was extremely upset and afraid over the whole thing. She was convinced in her mind that the police were sent to the shop by the Cosmetology Board to harass her and Ms. Ferstle. She suffered bouts of insomnia after arrest and was unable to settle down with any comfort at work. The fear associated with the experience visited her recurringly and about a week after the arrest she took a vacation off-island.

Ms. Holmes returned from vacation and was uncertain about wanting to return to work. She did at some time decide to go back to Mr. Paul's but was not hired again. She stated that her relationship with Ms. Ferstle had deteriorated and she worked for some time at another facility and did not continue for too long thereafter. She has resigned that it is not necessary for her to work again and relive the possibility of encountering the police again. She is aware that sometime in May, 1986, a conditional license was eventually given by the board but she has ceased from practicing since October or November, 1986.

We find the next meeting of the board, newly reconstituted, as having taken place sometime in early April 1986. The Court was not provided minutes of this meeting; at the same time, the oral testimony overlapped indiscriminately with dates and time frames. The Court was, however, supplied minutes for a 4/25/86 meeting and a 8/27/86 meeting. Unfortunately, these minutes are not free of dispute. First, Ms. Makaiwi as chairman and Ms. Annesley Dalton as the new secretary are at odds over whether the 4/25/86 minutes were supplied to and approved by the board. Second, the minutes themselves are contradictory in details of dates of prior meetings, prompting reservations about contemporaneity in their preparation.

42

We gather, however, on the evidence that a meeting took place in early April, 1986 to consider the Coast Guard letter dated March 10, 1986 which attorney Reardon had taken up earlier with Ms. Lefiti.

Yet again, the board was not moved. Questions were raised focusing on the apparent conflict between the text of this letter and the text of the prior telex. Whereas the telex alluded to "part time" employment of Ms. Holmes with the CG Exchange, the letter which followed dropped the reference to "part time". The board resolved to inquire into the discrepancy themselves.

A letter was to have been written and sent off on behalf of the board to clarify Ms. Holmes' Washington State work experience. Ms. Makaiwi was of the understanding that Ms. Annesley-Dalton would write the letter. Ms. Annesley-Dalton however was of the understanding that Ms. Makaiwi, as chairperson, would write the letter. In the interim, the annual Flag Day had arrived and necessarily, Ms. Makaiwi, as an employee of the department responsible in Flag Day preparations, did not call a board meeting until April 25, 1986.

At the 4/25/86 meeting of the board, the mixup with letter writing was confronted, and it was resolved that Ms. Makaiwi would compose a letter to be sent by registered mail, with each board member contributing $1.00 for postage. A letter went out under date April 26, 1986 to the board's Washington State counterpart, seeking verification that Ms. Holmes has had three years previous working experience and that she holds a current license with Washington.

We find another letter dated May 9, 1986 from the chairman of the board and addressed to Ms. Holmes referencing a board meeting of May 3, 1986, whereby it was decided that a provisional license be issued to Ms. Holmes, subject to verification of practical background. No minutes were supplied us of this meeting for details.

A business license was eventually issued to Ms. Ferstle to operate Mr. Paul's as a beauty salon subject to the conditional nature of Ms. Holmes provisional license, and subject to Ms. Holmes' remaining to work with Mr. Paul's to satisfy the

43

BCA's requirement that no facility license may be granted without a licensed operator aboard.

DISCUSSION

Our initial conclusion on the facts is that much of the tedium that arose with the evidentiary hearing in this matter could have been avoided if the parties had taken a little more time and effort with adequate pre-trial discovery. The defendants, while acquiescing in plaintiffs' trial setting requests, were content with a series of piecemeal summary judgment motions (even at the eve of trial) with apparently little concern for factual background investigation.

Plaintiffs on the other hand took much trial time to dwell on some potential theories which the evidence came no where close to sustaining. Consequently, the issues were ill defined and to the close of arguments it was apparent to the Court that plaintiffs' claims concerned the entire spectrum of any and all conceivable constitutional violations which might be subject to the remedial provisions of the federal Civil Rights Act, 42 U.S.C. sections 1983 and 1985. It was further suggested that there were remedies of a local nature which may arise, or ought to arise, by analogy with the mentioned civil rights enactment.

We turn to those theories of plaintiffs which should not have been considered had there been adequate pre-trial discovery.

The first of these would concern deprivation of rights through the board's alleged "revocation" of plaintiffs' licenses without procedural due process. As might be gathered from the above, there was much oral testimony, both direct and in rebuttal, concerning the date and time frame of the initial license application. The significance of this fact was that plaintiffs took the position that when they had first met with defendant Makaiwi, all other relevant government agencies had signed off their respective approvals on the license application. Plaintiffs were also sure that Ms. Makaiwi had signed in approval as well, and thus, they claim that a license was granted. It is claimed that they accordingly opened for business on Valentine's Day only to have their license revoked a few days afterwards when Ms. Makaiwi called to advise that a license could not

44

issue. In response at trial, Ms. Makaiwi was examined at length and testified to the contrary.

This dialogue on the stand, as it turned out, was entirely unnecessary had either party initially focused on the information given in the written license application itself.[8] This document revealed that neither Ms. Makaiwi nor the other agencies had at the time signed off on the application, hence the possibility of a license grant never occurred. A "revocation" without procedural due process argument therefore was totally misplaced. There was never a license to revoke in the first place.

Secondly, much of plaintiff Holmes' efforts centered on alleged deprivations consequent to arrest. We assume that the rights claimed as infringed concerned unlawful restraint of liberty and unreasonable search.[9] As it happened, the arresting officer was not made a party to the proceedings; therefore any actionable conduct by the officer would have to be attributed to the named defendants as co-conspirators, or imputed to the said defendants upon some cognizable theory of vicarious liability. Against this, the only direct evidence presented by Ms. Holmes was to the effect that she was sure in her mind at the time that the police had been sent by the Cosmetology Board to harass her and Ms. Ferstle.

The evidence of Officer Moana, on the other hand, which would have been available on pre-trial discovery, was that: the Commissioner of Public Safety had directed her to instigate the investigation a day or so before hand; she researched the BCA herself for the enactment's

---

[8] This document was admitted into evidence towards the end of trial, over defendants' objection, as an attachment to certain police reports moved into evidence for other purposes.

[9] Cf. Stogner v. Kentucky, 638 F. Supp 1 (W.D. Ky 1985). A warrantless search may be conducted of a pervasively regulated business or closely regulated industries [such as barbershops] long subject to close inspection and supervision. See also A.S.C.A §§ 31.1508, 31.1510.

requirements; her initial inquiries with the license records office referred her to, and led her to interview, the defendant Makaiwi; she investigated a number of salons on the day in question, including Mr. Paul's; while at Mr. Paul's, and based upon her own visual determination that a misdemeanor was being committed, she executed the arrest.[10]

After examining Officer Moana's written investigation reports, we find nothing untoward her testimony given. Even Ms. Holmes retracted noticeably on the stand, when asked about her impressions of Officer Moana's testimony. Plaintiffs had no evidence, apart from intuition, approaching a conspiracy theory.

For reasons of insufficient evidence, the Court rejects all claims against defendants premised on the hypothesis of conspiracy, collusion, or otherwise acting in concert with the arresting officer.

We are further unable to find on the evidence any issue of equal protection. There is nothing to suggest "purposeful discrimination", Snowden v. Hughes, 321 U.S 1 (1944), let alone evidence of any discrimination at all whether purposeful or otherwise. Nor do we find anything in the board's withholding of the license as being "completely arbitrary and discriminatory" so as to constitute a denial of equal protection. Niemotko v. Maryland, 340 U.S. 268 (1951). Plaintiffs contend that while they had supplied to the board all the information which the board required, the license was nonetheless refused; from this plaintiffs infer a violation of equal protection in that they regard themselves as having been treated differently than others similarly situated. The evidence was to the contrary.

First the BCA standards governing license qualification or eligibility are clearly articulated, and the validity of these standards is not challenged. Section 31.1504 of the BCA (A.S.C.A. § 31.1504) reads in pertinent part:

---

[10] 46 A.S.C.A. § 46.0805(4) not only authorizes a police officer, but makes it his duty, to make a warrantless arrest when a misdemeanor is committed in his presence.

(a) An operator may be licensed as a hairdresser and cosmetician provided the person is of good moral character; and

(1) is currently licensed to practice hairdressing in any state of the United States and has practiced as an operator for 3 out of the 5 years immediately preceding the application for licensure.

In the case of Ms. Ferstle, there can be no dispute with her ineligibility for licensure as an operator as she had only recently obtained certification from the State of California. She lacked practical standing.

Ms. Holmes on the other hand satisfied the first requirement of the enactment, to wit: currently licensed in another state. She was further required to demonstrate three years of practice within the preceding five year period. There is nothing mystical nor abstruse about this legislative directive and the standard having being legislative prescribed, what remained for the Cosmetology Board was a determination of factual issues and the application of the statutory criterion to them. The evidence was quite clear that plaintiffs were informed throughout the application process that the issuance of their licenses could not take place until they demonstrated that they had met one of the established standards, the practical experience requirement. Again, we stress our inability to find anything complicated about this standard that would require further elaboration by way of regulation or otherwise.

In viewing what plaintiffs had supplied the board, we find nothing arbitrary or capricious with the board's conclusions of insufficient showing.[11] We also note that the board is a fact finding body with a quasi judicial function, charged with the

---

[11]A reviewing court would probably have to take heed of the doctrine of primary jurisdiction. The social dangers prompting legislative regulation of the profession were significant. The regulatory board comprises not only a cross section of society but members of the profession themselves.

47

responsibility of examining qualification as legislatively prescribed. The board cannot be merely perfunctory in its duties given the social dangers which brought about the need to regulate the beauty treatment industry. The licensing of people who propose to work on the public with chemicals cannot, and should not, be undermined as a mere formality. As noted on the evidence, the Fono did not act on a perceived danger (beauty treatment was hardly culturally ingrained in the early 1970s) but on an actual and serious complaint. Further, the importance of maintaining proper implementation of the statute was again brought home vividly with the recent revocation of a license owing to another instance of severe chemical burns suffered by a member of the public.

In response to advice from the board for proof of practical experience, Ms. Holmes first presented a telex from the Coast Guard to certify that she had been employed by the Coast Guard Exchange for the past eight years as a "part time" hairdresser. This was not acceptable to the board for reasons above discussed. Again in response, Ms. Holmes subsequently supplied a letter from the same Coast Guard official with two variations to the content of the telex. That is, the reference to "part time" is dropped, and the official signed off with the notation "By direction". These variations are not without question. Ms. Holmes also supplied a copy of her State of Washington license which certified "standing" alone but not "practice". Again this was insufficient to the board, notwithstanding an intolerable amount of outside pressure to approve the licenses. The board stuck to its opinion and undertook to do some cross checking itself. It was either cross checking or a relenting to pressure that eventually gave rise to a provisional license.

Suffice it for us to say, however, that the conclusions arrived at by the Board cannot be said to have patently weighed against the proofs offered.

We accordingly conclude against any denial of equal protection.

We look to the remainder of plaintiffs' due process claims. As held above, plaintiffs' claims of due process denial based on a license "revocation" situation are without foundation.

48

Alternatively, plaintiffs have contended that the board had failed to provide them a hearing and thus an opportunity to be heard on the board's refusal to issue the licenses. This argument asserts a denial of procedural due process and presupposes that plaintiffs have a "property" and a "liberty" interest in the licenses sought, as these terms appear in the language of the Fourteenth Amendment.

Assuming that plaintiffs have such a protected interest, we hold for reasons given below that there was not a denial of due process in the circumstances.

It was explained by the Supreme Court in Mathews v. Eldridge, 424 U.S 319, 334 (1976) that

> [d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. (Citation omitted.) [It] is flexible and calls for such procedural protections as the particular situation demands.

Noting that the judicial model of an evidentiary hearing was neither required nor appeared to be the most efficacious method of decision making, the court generally stated that "the essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and an opportunity to meet it." Id at 348. Thus the requirements of due process contextually vary with the circumstances and the particular demands of the case. The only constant factor apparent with the Court in the review of its prior decisions is "that some sort of hearing is required before an individual is finally deprived of a property interest," Id at 333 (emphasis added). See also Parratt v. Taylor 451 U.S 527, 540 (1981). The opportunity to be heard is an opportunity which must be granted "at a meaningful time and in a meaningful manner." Mathews, supra. In Parratt, the court took care to point out that "at a meaningful time and meaningful manner" did not always mean a hearing opportunity prior to the initial deprivation of property. In Mathews a pre-deprivation hearing was seen as the exception "from the ordinary principle, established by [the] decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." Id. at 343.

49

In the light of these observations, we find on the factual circumstances before us that plaintiffs were in fact accorded more process than due. Firstly, there was no adverse administrative action by the Cosmetology Board that constituted a "final" deprivation of property that would trigger the due process requirements of notice and an opportunity to be heard. We find nothing suggestive on the evidence that the Cosmetology Board's actions were tantamount to a denial of the license. Indeed, the resultant procedure utilized by the board approximated notice and the opportunity to be heard. Plaintiffs were advised from the outset, not only by the clear mandates of the BCA but by Ms. Makaiwi, that plaintiff Holmes would have to demonstrate proof of the BCA's practical requirement. Ms. Holmes supplied a telexed communication which the board promptly considered. Plaintiffs were advised of the board's findings of insufficiency and the proceedings did not conclude there. Plaintiff Holmes then tendered a further Coast Guard communication as well as her Washington State license. Again the board gave consideration to these proofs and finding the same to be inconclusive of the BCA's criteria, their decision was made known to plaintiffs. Yet again, the proceedings did not terminate there. The board had not issued a denial and the proceedings were open to further submission of proofs.[12] Had the board

---

[12]We are not unmindful of the possibility that an administrative agency might resort to recurring delay tactics which in the proper circumstances may amount to a denial of protected rights, but we do not feel that the circumstances here were such. Plaintiffs themselves could not escape blame for the delay as the burden was on them to expeditiously supply sufficient proofs as required by the BCA. See A.S.C.A. § 31.1503(a). On the contrary, it appears that plaintiffs gave up on further pursuit of proofs after supplying the referenced Coast Guard letter and were content to allow the licensing exercise to escalate to one of third parties --- the Governor's staff, the board's attorney, the new board membership, the Governor --- attempting to impress upon the board that the submitted proofs were sufficient. The board on the other hand

proposed any final action to deny the application, a due process proceeding would then be required, see A.S.C.A. § 31.1508, and the hearing demanded by plaintiffs would be appropriate. Mathews v. Eldridge, supra; Parratt v. Taylor, supra.

Indeed, the interim procedures utilized by the board were constitutionally sufficient when considered in the light of the criteria announced in Mathews, 424 U.S at 335, namely; (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The private interest concerned in this matter is a benefit in expectation subject to articulated standards of qualification. Proof of this qualification is within the plaintiffs' control and any prejudice due to delay is also within that control. As plaintiffs were initial applicants they suffered no prejudice or loss through a change in status owing to any action or inaction on the part of the board that is apparent on the evidence. Indeed, the benefit under consideration is even more contingent than the benefit considered in Mathews, supra. In Mathews, the benefits considered were medical disability payments which were terminated through an interim procedure pending further investigation and showing of a continuing medical disability. In a sense, this was an accrued benefit and not one in expectation.

Turning to the second criterion, we cannot conclude that there was a risk of erroneous deprivation of interest owing to the procedures used by the board. As stated above, the procedures afforded procedural due process although undertaken in a piecemeal fashion. Plaintiffs were advised of the needed showing, and responded with a series of

---

rather than issuing a "denial" then, as it could have, took upon itself the burden of seeking those proofs, and hence kept its proceedings open for further action and the opportunity to be persuaded otherwise.

proofs. In turn they were appraised on the inadequacies of the tendered proofs.

In any event, we do not see how the board's resultant conclusions could have been otherwise even if the opportunity to be heard had been granted in the manner now demanded by plaintiffs rather than in the way the situation actually unfolded. The only proof tendered with this demand was the referenced Coast Guard letter transmitted "By direction" and so blatantly at variance with the content of the prior telexed communication. In these circumstances, it is not for the Court to say that a reasonable fact finder could not have concluded as did the board.

Finally in terms of territorial interest and fiscal considerations, we do not find that the proceedings initially used by the board are without place. As stated in Mathews, 424 U.S. at 348, "[t]he ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." It is consideration of administrative efficiency as necessarily limited by the standard of fairness.

With the Cosmetology Board's procedures, the majority of the cases ought to be settled without the need for a judicial type hearing. If the BCA's objective standards are met, there is no discretion with the board but to issue the license. See A.S.C.A. § 31.1503(a). As noted above, there is nothing difficult about these standards, and in the normal course, license approvals would be straight forward if applicants show ready compliance with the burden of proof expected of them. It follows therefore that the need for a judicial type hearing on every application, with attendant consumption of time, money, personnel and the like, is not optimum. These hearings are only required when proposed board action is to be final. This is our reading of A.S.C.A. § 31.1508 and as long as there is room for administrative efficiency --- the board keeping its proceedings open for further consideration of proofs --- without compromising fairness, the requirements of procedural due process will not have arisen.

We conclude that an evidentiary hearing was not required herein and that the board's proceedings were fully in comport with due process.

For the foregoing reasons judgment is entered in favor of the defendants.

APPENDIX "A"

TO: COSMETOLOGY BOARD
SUBJ: PROOF OF EMPLOYMENT

1. THE ENCLOSED, IS A MILITARY COMMUNICATIONS DISPATCH SENT FROM THE COAST GUARD COMMUNICATIONS CENTER IN SEATTLE WASHINGTON. AS THE PERSONNEL IN THE OFFICE OF COMMUNICATIONS WILL VERIFY, IT CAN NOT BE FORGED AND A LASTING RECORD OF IT IS AVAILABLE UPON REQUEST THROUGH THE U.S. MILITARY. IN ADDITION, I HAVE NOTARIZED THE COPY AS A DULY DESIGNATED NOTARY UNDER FEDERAL LAW. I HAVE ALSO TAKEN THE TROUBLE OF CHECKING THE VALIDITY OF THIS DOCUMENT WITH THE OFFICE OF THE GOVERNOR. THEY STATED THAT IT IS QUITE ACCEPTABLE AND THAT IF ANY PROBLEM ARISES OVER ITS ACCEPTANCE, I SHOULD LET THEM KNOW. THANK YOU FOR YOUR ASSISTANCE ON THIS MATTER. IF THERE ARE ANY QUESTIONS ABOUT THE DOCUMENT, I WOULD BE HAPPY TO ANSWER THEM.

/s/LT J.M.HOLMES